UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

IRVING M. SCHWARTZ,

                Plaintiff,

-vs-                             Case No.  5:05-cv-420-Oc-10GRJ

SPRINT CORPORATION and THE
SPRINT BENEFIT ADMINISTRATIVE
COMMITTEE and EMBARQ
CORPORATION,

                Defendants.
_____/

# O R D E R

     Plaintiff Irving M. Schwartz has sued Defendants Sprint Corporation, the Sprint Benefit Administrative Committee, and Embarq Corporation claiming that the Defendants unlawfully terminated his retiree medical benefits, rather than simply suspending those benefits as Mr. Schwartz allegedly intended.  The parties agree that the plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, that Sprint Corporation is the plan administrator, and that the Sprint Benefits Administrative Committee is the claims administrator and claims fiduciary.

     Both parties have filed motions for summary judgment (Docs. 30 & 31), and both agree that there are no disputed issues of material fact, so that the case may be resolved on the basis of the administrative record before the Court.  Because the Court concludes that the Defendants' decision to terminate the Plaintiff's participation in the retiree medical

benefits plan was correct, summary judgment is due to be granted in favor of the Defendants.

## BACKGROUND AND FACTS

### I.    The Parties

The Plaintiff, Irving M. Schwartz, is a long-term employee of Sprint-Florida, Inc., a subsidiary of Defendant Sprint Corporation.  After nearly thirty (30) years of employment, Schwartz retired on October 1, 2000.  As a retiree of a company affiliated with Sprint, Schwartz was eligible to participate in Sprint's retiree benefits plans, including Sprint's retiree medical benefits plan.  Schwartz chose to do so, and elected coverage immediately prior to his retirement.

At all relevant times, Defendant Sprint Corporation ("Sprint") was the plan administrator for the retiree medical benefits plan, and Defendant Sprint Benefit Administrative Committee ("BAC") was the claims fiduciary with respect to Schwartz's claim.[1]  The Sprint Board of Directors appoints the membership of the BAC, and at the time of Schwartz's claim the BAC consisted of five high-level corporate officers.[2]  Sprint was also the plan sponsor of the Plan, and funded the Plan.[3]  Defendant Embarq Corporation is a newly-formed corporation resulting from Sprint's spin-off of its local

---

[1]See United Telecom Retiree Medical Plan ("Plan"), §§ 6.1, 6.3 (Doc. 30-6).

[2]Id.; see also Deposition of Mark P. Herman ("Herman Dep."), pp. 13-14 (Doc. 29-2).

[3]See Deposition of E. J. Holland, Jr. ("Holland Dep."), p. 10.

telecommunications division, which included Schwartz's former employer, Sprint-Florida, Inc.  All former employees of Sprint-Florida who were participants in the Sprint's retiree benefits plans are now participants in Embarq's retiree plans, including the Embarq Retiree Medical Plan.  Thus, if Schwartz prevails on his claim, he will become a participant in the Embarq Plan.[4]

## II.    The Retiree Medical Benefits Plan

The official name of Sprint's retiree medical benefits plan at the time of Schwartz's claim was the "United Telecom Retiree Medical Plan ("the Plan"),[5] and its effective date is January 1, 1990.  The terms and conditions of the Plan are contained in two written documents:  the Plan document itself and the Retiree Benefits Summary Plan Description, which is provided to each eligible participant.  All employees of Sprint and its affiliated companies who retired after December 31, 1990 are eligible to participate in the Plan, and are automatically enrolled as of the first day of the month following their retirement.[6]  Prior to beginning their participation (*i.e.* prior to retirement), each eligible employee must complete and submit an enrollment form whereby the employee elects a specific level and type of medical coverage, provides information about any dependents, and elects to have

---

[4]See Deposition of Randall T. Parker ("Parker Dep."), pp. 5-6,

[5]United Telecom is the predecessor of Sprint.

[6]Plan, §§ 1.6, 2.1.

3

or to forego dental coverage.[7]  If an eligible employee fails to submit the enrollment  form before retiring, a default election is made.[8]

The Plan also provides for a cessation of benefits.  A participant who dies or fails to pay his or her share of the cost of coverage will cease to participate in the Plan on the first day of the month following either event.[9]  With certain exceptions, a dependent's participation will also cease at the same time.[10]  A participant can also choose to suspend coverage, including dependent coverage.[11]  Suspension of coverage occurs when the participant begins employment with another employer who is not affiliated with Sprint, and the non-affiliated employer provides medical coverage.  In such instances, the participant must use the coverage provided by the non-affiliated employer,[12] and can elect to suspend participation in the Plan.  The period of suspension can run for as long as the participant is covered by the non-affiliated employer's insurance.[13]

---

[7]Id., § 2.2.

[8]Id.

[9]Id.; § 2.3.

[10]A dependant spouse may elect to continue coverage for an additional six months following a participant's death, and may elect after that time period to continue coverage by paying the full amount of the insurance premiums. See Plan, § 5.2.

[11]Plan, § 2.4.

[12]In fact, if the participant does not accept the coverage provided by the new employer, the participant will cease to be a participant in the Plan.  See Plan, § 2.4(a).

[13]Plan, § 2.4.

During the suspension period, the participant does not have to make any payments to the Plan and does not receive any benefits from the Plan.[14]  Participants who elect to suspend coverage must notify the Plan and resume coverage within 60 days after coverage with the non-affiliated employer ends.  A participant who fails to adhere to this time period will cease to participate in the Plan.[15]

Other than the provisions concerning cessation and suspension of coverage, it is critical to this case that the Plan does not contain any provisions for waiving participation in the Plan.  The Plan has also been amended several times.  None of the amendments address waiving coverage.[16]

The Plan states that Sprint is the plan administrator, and "has the authority to control and manage the operation and administration of the Plan."[17]  The named fiduciary of the Plan is the Sprint Welfare Plan Administration Committee, whose membership is selected by the Sprint Board of Directors.[18]   The Plan provides the Committee with "any

---

[14]Id.

[15]Id., § 2.4(e).

[16]Parker Dep., pp. 10-11, 76.

[17]Id., § 6.1.

[18]Id., §§ 6.2, 6.3.  Although not entirely clear, it appears that Defendant BAC is a sub-committee of the Welfare Plan Administration Committee.  The BAC is the committee responsible for handling claimant appeals for Sprint's company-sponsored benefit plans, as well as appeals for stock options and stock ownership plans.  See Parker Dep., p. 13.  The parties do not dispute that the BAC was the claims fiduciary at all times relevant to this case.

responsibilities and duties under this Plan which are not specifically delegated to anyone else," including but not limited to the following:

- to make and enforce such rules and regulations of the Plan and prescribe the use of such forms as it shall deem necessary for the efficient administration of the Plan;
- to require any person to furnish such information as it may request as a condition to receiving any benefit under the Plan;
- to decide on questions concerning the Plan and the eligibility of any Employee to participate in the Plan, in accordance with the provisions of the Plan; and
- to compute or have computed the amount of benefits which shall be payable to any person in accordance with the provisions of the Plan.[19]

The Plan also provides the Committee with the authority and discretion to  interpret Plan provisions.  In particular:

[t]he Committee shall have the sole discretion to make decisions and take any action with respect to questions arising in connection with the Plan, including but not limited to the construction and interpretation of the Plan and the determination of eligibility for benefits under the Plan.  Any such decision or action shall be final and binding upon all Participants and Dependants.[20]

Although it is not clear whether participants automatically receive a copy of the Plan itself, each participant does receive a copy of the Retiree Benefits Summary Plan Description ("SPD").  The version which was in effect at all times relevant to this case, is dated August 1999, and covers all retiree benefits, including the Plan.  As its name suggests, the SPD provides participants with a summary of the relevant aspects of the Plan, such as eligibility and when coverage begins, types of coverage, exceptions to

---

[19]Plan, § 6.3.

[20]Id., § 6.4.

6

coverage, and how to change, end, or suspend coverage.  Unlike the Plan document, the SPD contains a brief reference to terminating coverage, stating that "[y]ou may stop participating in the Retiree Medical Plan on the first day of any month."[21]  This statement, however, refers to the two occasions when coverages ceases (death and failure to pay the participant's share of coverage).[22]  The SPD does not  contain any provisions describing how a participant can affirmatively waive coverage once the participant joins the Plan.[23]

In addition to the SPD, all Plan participants receive an Enrollment Guide every year at the beginning of Sprint's "open enrollment" period.[24]  The Guide briefly explains any changes to the benefits from the prior calendar year, and lists the benefits options available for that particular calendar year.  Each participant is advised to review the Guide carefully, along with an attached Retiree Benefits Information Form, which lists the participant's current benefit status.[25]  The Guide also provides instructions on how to change benefit options, enroll in new benefit plans, and how to suspend coverage.

_____

[21]See SPD, p. 8 (Doc. 30-7).

[22]Id., pp. 8-9.

[23]The SPD does mention that if an eligible employee does not submit an enrollment form prior to retirement, the employee waives coverage and is ineligible to participate in the Plan in the future.  The SPD also discusses in the Life Insurance Coverage section how a participant can "irrevocably elect to waive" basic life insurance coverage.  Neither of these provisions are implicated in this case.

[24]All participants in Sprint benefits plans must re-enroll each year in their desired benefits plans.  During "open enrollment" a participant may change coverage where available.

[25]See 2004 Enrollment Guide, pp. 2-3 (Doc. 30-9).

While not entirely clear, it appears that the 2004 Enrollment Guide is the first written communication from Sprint which explained how participants can waive coverage and the effects of waiving coverage.  For example, the Guide explicitly states, in highlighted text, that "[i]f you waive coverage, you never again will be eligible to participate in any of the Sprint Retiree Medical options."[26]  The Guide further states that in order to waive coverage, a participant must complete and submit to Sprint a "Waiver of Medical/Dental Coverage Form."[27]  In another section, the Guide explains that if a participant does not return the waiver of medical and/or dental coverage form, the participant will still receive default coverage.[28]  In other words, the Guide makes clear that  a participant must affirmatively elect to waive benefits in order to be forever removed from the medical benefits plan.

The Guide also informs each participant that if they do not enroll in any benefit plans, that they will receive default coverage.[29]  For example, a participant who was previously enrolled and whose coverage is still available will keep the same medical and prescription drug coverage from the previous year.  Thus, if a participant does nothing during the "open enrollment" period, the participant will not lose coverage, but will simply receive default coverage.

---

[26]Id., p. 9.

[27]Id., p. 35.

[28]Id., p. 36.

[29]Id., p. 33.

The 2004 Enrollment Guide contains one final new addition.  For the first time, Plan participants were enabled to make enrollment changes, suspend coverage, and waive coverage by using Sprint's toll-free automated telephone enrollment system.[30]

## III.    Schwartz's Participation in the Plan

Schwartz became a participant in the Plan immediately following his October 2000 retirement.  He remained an active participant in the Plan until April 17, 2001, when he elected to suspend his medical coverage.   At that time, Schwartz had accepted employment with Telect, Inc., an entity not affiliated with Sprint, which provided Schwartz with medical insurance coverage.   Thus, in accordance with the terms of the Plan, Schwartz notified the Plan that he had obtained other medical coverage from a non-affiliated employer, and suspended coverage.   While his coverage was suspended, Schwartz did not make any payments to the Plan.

Schwartz continued to suspend his coverage for the 2001, 2002 and 2003 Plan years.[31]  In October 2001, Schwartz affirmatively elected to remain in suspended status.[32] In the Fall of 2002, however, Schwartz did not make an active election, and accordingly his previous year's election to suspend coverage was automatically carried over for the 2003 Plan year.

---

[30]Id., p. 30.  See also Parker Dep., p. 18.

[31]The Plan defines a "Plan Year" as a calendar year.

[32]See Enrollment Form dated October 15, 2001 (SPR0133).  The Parties have submitted portions of the administrative record, which have been internally labeled with the prefix "SPR." To avoid confusion, the Court will use this same prefix to identify documents from the record.

9

In the Fall of 2003, Schwartz received his Enrollment Guide for the 2004 Plan year. Upon reviewing the Guide, Schwartz learned that he could use Sprint's automated telephone system to make any changes to his benefits.  Schwartz called Sprint's benefits call center, the Sprint Employee Solutions Network, on November 7, 2003, to inquire about his benefits.  There is no record of what questions Schwartz asked, but the telephone log notes indicate that Schwartz was advised that if he wanted to stop suspending his benefits, he would have to call the Sprint automated telephone system, known as the "FonFlex" system - to make the change.[33]  He was also informed that if he stopped suspension, his medical benefits would be at the same level and type as they were pre-suspension, and that he could change them during the next open enrollment period.[34]

That same day, Schwartz called into Sprint's FonFlex system.  Instead of suspending his coverage, however, he apparently used the phone touch pad to elect to irrevocably waive his medical coverage.  Based on this election, Sprint sent Schwartz a Confirmation Statement for the 2004 plan year, which clearly showed Schwartz's election to waive his participation in the Plan.[35]  The Confirmation Statement expressly stated: "PLEASE NOTE: Look over your statement carefully.  If you disagree with any of the above insurance

---

[33]See "Second Level FlexCare Appeal" (SPR0173-175).

[34]Id.

[35]See Confirmation Statement dated November 8, 2003 (SPR0136).

information, it is important that you immediately contact the Sprint Retirement Service Center at 1-800-697-6000."[36]

The Confirmation Statement further stated that, based on his election, Schwartz was required to complete and submit an attached Waiver of Medical/Dental Coverage Form.[37] The Waiver Form states:

> I understand that my election is irrevocable and that I will never be able to elect coverage under the Sprint Retiree Medical Plan/Prescription Drug Program and/or Dental Plan once I have made this election.[38]

Schwartz completed the Waiver Form, checking the boxes to waive coverage for himself and his spouse and/or dependents under the Plan, signed the form, dated it November 17, 2003, and returned it to Sprint.[39]  Upon receipt of the Waiver Form, Sprint removed Schwartz from the Plan.

## IV.  Administrative Review of Schwartz's Claim

Schwartz did not make any further inquiries about the status of his participation in the Plan until November 19, 2004 - more than one year after he waived his coverage.  At that time, he contacted Sprint to ask why he had not received his Enrollment Guide for the 2005 Plan Year.  Sprint advised Schwartz that he had waived coverage during the last

---

[36]Id.

[37]Id..

[38]See Sprint Retiree Waiver of Medical/Prescription Drug/Dental Coverage Form dated November 17, 2003 (SPR0135).

[39]Id.

enrollment period, and informed Schwartz that he was no longer a Plan participant. Schwartz immediately appealed this decision, stating that his election to waive coverage was in error, and that he had intended to continue suspension of his coverage.

Schwartz submitted his first appeal to the Benefit Appeals section of the Employee Solutions Network.[40]  This appeal was denied,[41] and Schwartz filed a second appeal with the plan administrator.[42]  Sprint had designated Randall Parker, the Director of Benefits Strategy and Sprint Benefits Brand Management, as the plan administrator for the Plan, and he reviewed Schwartz's appeal.  Parker denied the appeal by letter dated April 25, 2005.[43]  At that time, Parker advised Schwartz that he could file a written administrative appeal with the BAC within 60 days of receipt of the letter, and could submit additional evidence to support his claim.[44]

Schwartz did so and submitted his final appeal to the BAC on June 22, 2005, together with a letter attempting to explain that his waiver was a mistake and that he had intended to continue suspending coverage.[45]  In his letter, Schwartz explained that he had

---

[40]See E-mail from Irving Schwartz to Appeal Benefit, dated November 19, 2004 (SPR0178).

[41]See E-mail from Appeal Benefit to Irving Schwartz, dated January 10, 2005 (SPR0177)

[42]See Letter from Irving Schwartz to Sprint Plan Administrator, dated January 18, 2005 (SPR0176).

[43]See Letter from Randall T. Parker to Irving Schwartz, dated April 25, 2005 (SPR0168-169).

[44]Id.

[45]See Letter from Irving Schwartz to Benefit Administrative Committee, dated June 22, 2005
(continued...)

contacted the Employee Solutions Network in 2003 because of his concern that he may soon lose his current job and medical coverage, and that he had inquired as to the process for un-suspending his Sprint retiree medical coverage.[46]   According to Schwartz, his telephone call in 2003 clearly demonstrated his intent to maintain his coverage with Sprint.

Schwartz further stated that he did not remember signing the Waiver Form and was "in a state of shock when [he] received it and saw [his] signature."[47]  In essence, Schwartz argued that his waiver was a mistake, and that he signed and submitted the Waiver Form while under "extreme stress concerning [his] current employment and health benefits" and may not have been "in the proper frame of mind to weigh the importance of [his] actions."[48] Schwartz also argued that the Plan document itself did not contain any provisions about waiving benefits; that he believed he could only waive coverage at the time he initially enrolled in the Plan; that the waiver process should require a signature by his spouse and/or dependents who would also lose coverage; and that he obviously made a mistake as it made no sense to waive coverage absent some sort of financial compensation.

---

[45](...continued)
(SPR0140-142).

[46]Schwartz did not lose his job and remains employed by Telect to date.

[47]SPR0141.

[48]SPR0142.

On August 22, 2005, four of the five members of the BAC met to consider Schwartz's and other participants' appeals.[49]  The BAC considered Schwartz's arguments in his June 22, 2005 letter and prior appeal communications, his Waiver Form, and a synopsis of his claim presented by Parker.  At the conclusion of the hearing, the BAC voted to deny Schwartz's appeal.  Mark Herman, the BAC Secretary and Sprint Senior Counsel sent a letter dated September 1, 2005 to Schwartz informing him of the BAC's decision to deny his final appeal.[50]

Throughout this multi-step appeals process, Schwartz's appeal was denied on the basis of the language in the 2004 Enrollment Guide discussing waiver, Schwartz's selection of waiver through the FonFlex system, and his Waiver Form.  The plan administrator and the BAC treated all of this information as clear and objective evidence of Schwartz's intent to irrevocably waive coverage.  Neither entity considered any subjective evidence of Schwartz's intent, other than his appeal letter.

## V.   Procedural History

Following the final denial of his appeal, Schwartz filed a timely complaint (Doc. 1) in this Court on October 6, 2005 against Sprint and the BAC alleging a single claim that he

---

[49]See Minutes from Benefit Administrative Committee Meeting, dated August 22, 2005 (SPR0201-204).

[50]See Letter from Mark P. Harman to Irving Schwartz, dated September 1, 2005 (SPR0128-129).

has been denied retiree medical benefits in violation of 29 U.S.C. § 1132.[51]  Schwartz filed

an amended complaint (Doc. 20) on June 30, 2006 to include Embarq as a defendant.

Following the completion of discovery, the parties filed cross-motions for summary

judgment (Docs. 30, 31).

## STANDARDS OF REVIEW

### I.    Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment "shall be

rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law."  The

parties agree that there are no disputed issues of material fact and that this matter may be

resolved on the parties' motions.[52]  It is the law of the Circuit that where the operative facts

are undisputed and the case turns on the ultimate factual inference or conclusion to be

drawn from the operative facts, the court may proceed to decision where the judge (and

not a jury) is the factfinder and a trial would reveal no additional useful evidence.  Nunez

v. Superior Oil Co., 572 F.2d 1119, 1123-24 (5th Cir. 1978).  Thus, the Court is in a position

---

[51]Schwartz does not specify in his complaint or amended complaint the precise section of ERISA through which he seeks relief.  However, it is clear from a reading of his motion for summary judgment, that he is proceeding under 29 U.S.C. § 1132(a)(1)(B) and seeks to recover benefits and/or enforce his rights under the terms of the Plan.

[52] Docs. 30, 31, & 37.

to resolve this case as a matter of law based on the undisputed record and any inferences to be drawn therefrom.

## II. ERISA

Section 1132(a)(1)(B) of ERISA provides that a plan participant or beneficiary may bring a civil action in district court "to recover benefits due to him under the terms of his plan." ERISA, however, does not specify the standard to be applied when reviewing a plan administrator's decision to deny benefits. To fill this gap, the Supreme Court held in Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989):

> a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

If the plan documents explicitly grant the claims administrator discretion to determine eligibility for benefits or to construe the terms of the plan, then the claims administrator's decision to deny benefits is reviewed for abuse of discretion. HCA Health Servs. of Georgia, Inc. v. Employers Health Ins. Co., 240 F.3d 982, 992 (11th Cir. 2001). That is to say, the decision will not be disturbed unless it was arbitrary or capricious. Jett v. Blue Cross & Blue Shield, 890 F.2d 1137, 1139 (11th Cir. 1989). A decision is arbitrary and capricious if it is unreasonable in light of the evidence before the claims administrator at the time the decision was made. Id. In other words

> [w]hen conducting a review of an ERISA benefits denial under an arbitrary and capricious standard . . . the function of the court is

16

> to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made.

Id.

This deferential standard is modified, however, in situations where the claims administrator is operating under a conflict of interest.  HCA Health Servs., 240 F.3d at 993.[53]  If a conflict of interest exists, then the deference afforded by arbitrary and capricious review is diminished, and the Court reviews the decision under the "heightened" arbitrary and capricious standard.  HCA Health Servs., 240 F.3d at 993.[54]  Once the Court determines the appropriate standard, it must apply that standard to the claims administrator's factual determinations and plan interpretation with equal force.  Torres v. Pittston Co., 346 F.3d 1324, 1329 (11th Cir. 2003).

The parties agree that the plan documents give the BAC the discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  Thus, they agree under Bruch and its progeny that the Court is to apply the arbitrary and capricious standard

---

[53]See also Brown v. Blue Cross & Blue Shield, 898 F.2d 1556, 1563 (11th Cir. 1990) ("[T]he application of the standard is shaped by the circumstances of the inherent conflict of interest."); Firestone Tire & Rubber, 489 U.S. at 115 ("Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion.") (internal quotations omitted).

[54]In other words, the Eleventh Circuit "has adopted the following standards for reviewing administrators' plan interpretations: (1) de novo where the plan does not grant the administrator discretion; (2) arbitrary and capricious [where] the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interest." Buckley v. Metropolitan Life, 115 F.3d 936, 939 (11th Cir. 1997).

17

of review in determining whether the decision to terminate the Plaintiff's benefits was "wrong."  The parties disagree, however, as to whether the BAC made its decision while under a conflict of interest - *i.e.*, whether the "heightened" arbitrary and capricious standard should apply.  Regardless of which standard applies, the Court first must "evaluate[] the claims administrator's interpretation of the plan to determine whether it is 'wrong.'" HCA Health Servs., 240 F.3d at 993; Brown, 898 F.2d at 1566, n. 12.  "Wrong" is the label used to describe "the conclusion a court reaches when, after reviewing the plan documents and disputed terms *de novo*, the court disagrees with the claims administrator's plan interpretation." HCA Health Servs., 240 F.3d at 994, n. 23.  If the Court determines that the claims administrator's decision was not wrong, then summary judgment must be entered in favor of the Defendants.  If, on the other hand the Court concludes that the decision was wrong, it will then decide whether the administrator's decisions was nevertheless reasonable in light of the facts known to the administrator at the time the decision was made.  Id. at 994 ("We cannot over emphasize the importance of the discretion afforded a claims administrator; the underlying premise of arbitrary and capricious, rather than *de novo*, review is that a court defers to the discretion afforded the claims administrator under the terms of the plan.").

It is at this point in the analysis that the Court must consider the self interest of the claims administrator.  Id.  If no conflict of interest exists, then the arbitrary and capricious standard requires that the claims administrator's wrong but reasonable decision must stand.  If, however, a conflict of interest exists, the Court applies the heightened arbitrary

and capricious standard, and the burden shifts to the claims administrator to prove that its decision was not tainted by self interest. Id. at 994-95. "[A] wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries." Brown, 898 F.2d at 1566-67. Accordingly, if the Court determines that the claims administrator has failed to meet its burden of establishing that its decision benefits the class of participants and beneficiaries, then the decision is not entitled to deference. HCA Health Servs., 240 F.3d at 995. Even if the claims administrator carries its burden in this respect, the Plaintiff may still succeed if he can show that the decision is "arbitrary and capricious by other measures." Brown, 898 F.2d at 1568; see also HCA Health Servs., 240 F.3d at 995.

## DISCUSSION

### I.   Schwartz Was Provided a Full and Fair Review

When a participant challenges the denial of a claim, ERISA mandates that the participant be given a "full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2). The interpretive regulations expand on this requirement and define "full and fair review" to mean that: (1) the participant is provided at least 60 days following receipt of a notification of an adverse benefit determination within which to appeal the determination; (2) the participant has the opportunity to submit written

comments, documents, records, and other information relating to the claim; (3) the participant is provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits; and (4) the appropriate named fiduciary's review takes into account all comments, documents, records, and other information submitted by the participant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.  29 C.F.R. § 2560.503-1(h)(2)(i) - (iv).

The undisputed facts demonstrate that the BAC satisfied all of these requirements. Schwartz received more than 60 days to file his appeal, and he submitted additional documentation in the form of a letter explaining his actions and arguing why the Waiver Form should be disregarded.  Schwartz was also given the opportunity to review and obtain copies of all relevant documents, and he was provided a copy of the Waiver Form on at least one occasion.  It is also undisputed that the BAC (either directly or through a summary by Parker) considered all of the relevant documents:  the Plan, the SPD, the Enrollment Guide, Schwartz's Waiver Form, the telephone log from Sprint's Employee Benefits Network, and Schwartz's prior history of participant in the Plan. Thus, on its face it appears that Schwartz obtained a "full and fair" review of his claim.

Schwartz, however, argues that he did not receive a "full and fair" review because the BAC did not investigate or consider any subjective evidence on the issue of whether Schwartz's waiver of his retiree medical benefits was knowing and voluntary.  According to Schwartz, the only document the BAC considered was a summary by Parker of

Schwartz's claim and the completed Waiver Form, which were merely objective evidence.

There is no dispute that the BAC relied solely on objective evidence.  However, that is all the BAC was required to do.[55]  See, e.g. Hufford v. Harris Corp., 322 F. Supp.2d 1345, 1356 (M.D. Fla. 2004) (plan administrator may reasonably require objective medical evidence supporting a long-term disability claim rather than the claimant's subjective complaints of pain and other ailments).  See also Diaz v. Verizon Wireless Employee Benefits Committee, Case No. 8:04CV2031T27MAP, 2006 WL 2471517 (M.D. Fla. Aug. 24, 2006) (noting that plan participant must submit objective evidence to support a claim for medical benefits); Maniatty v. UNUM Provident Corp, 218 F. Supp.2d 500, 504 (S.D.N.Y. 2002) ("The very concept of proof connotes objectivity. . . ."); Wilkins v. Baptist Healthcare System, Inc., 150 F.3d 609, 616-17 (6th Cir. 1998) (affirming district court's grant of summary judgment in favor of plan administrator where claimant failed to provide any objective evidence supporting his disability claim).

The Court is unable to locate any authority to support Schwartz's proposition that the BAC must ignore clear objective evidence and delve into a participant's subjective intent behind his or her coverage choices.[56]  It makes sense that no such authority would exist

---

[55]Moreover, it was Schwartz's responsibility to present any evidence - subjective or otherwise - to support his claim that his waiver of coverage was a mistake.  Other than his June 22, 2005 letter, and despite having several opportunities throughout the claims and appeals process, he chose not to do so.

[56]The only decision Schwartz cites is neither relevant nor persuasive.  Costantino v. TRW, Inc., 13 F.3d 969 (6th Cir. 1994) discusses the purposes behind ERISA's requirement that a
(continued...)

because if subjective intent were the test to determine coverage it would obviate ERISA's central goals: "(1) [the] protection of the interests of employees and their beneficiaries in employee benefit plans . . . and (2) uniformity in the administration of employee benefit plans." Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1041 (11th Cir. 1998) (citations omitted).  Accordingly, the Court cannot accept Schwartz's theory on this point.

**B.    The BAC's Interpretation of the Plan Was Correct and Reasonable.**

At first impression, it is tempting to conclude that the BAC was wrong it its denial of Schwartz's claim based on his waiver because the plan documents do not mention "waivers."   Reduced to its simplest possible description, the BAC was purporting to administer a provision of the plan that literally did not exist.  In any context other than a participant's voluntary election to withdraw from the plan, an administrator would almost certainly run afoul of ERISA when attempting to create, and then administer, a plan provision not contained in the plan documents.  Here, however, the Court is dealing with a simple process in which a plan participant voluntarily notifies the plan administrator that he, the participant, wishes to withdraw from the plan.  Surely that must be the right of the participant with or without the presence of a waiver provision in the plan documents.[57]

---

[56](...continued)
participant first exhaust all administrative remedies prior to filing suit.  It does not speak to the question of whether subjective evidence must be considered during the administrative review process.

[57]Cf. Laniok v. Advisory Comm. of the Brainerd Mfg. Co. Pension Plan, 935 F.2d 1360, 1364 (2d Cir. 1991) ("we have found no provision. . . generally prohibiting an individual from waiving his right to participate in a pension plan.").

The proof of this proposition is revealed when one looks at the case from the perspective of the Plan.  If the Plan was the plaintiff seeking to recover unpaid premiums from Schwartz on the thesis that his waiver or withdrawal was ineffectual because the Plan is silent on the subject, no reasonable jurist would credit that argument.

Stated another way, absent a clearly expressed provision in an ERISA plan binding the participant to continue as such for a specified time or under specified conditions, the participant necessarily has the implied right to terminate, withdraw from, or "waive" his participation at any time.[58]  It follows that, in those circumstances, the plan administrators also have the implied right to set up reasonable procedures governing the communication and verification of elections by participants to withdraw.  In this case the participant - not once but twice - communicated to the plan administrators using their established procedures that he wished to withdraw.  He did this during the automated telephone call and again in filling out the written form later.  Furthermore, the written form was clear and

---

[58]Schwartz's argument that he would have no reason to waive or abandon his Sprint retiree benefits coverage, and that the Defendants knew or should have known this, does not undermine the appropriate legal analysis.  While Schwartz himself may have had no economic incentive to waive the coverage, other participants might have any number of reasons to withdraw, such as avoidance of future premiums, for example, due to the purchase of alternative coverage.

unambiguous, and no argument has been made to the contrary.[59]  Thus, the Defendants'
decision to enforce Schwartz's voluntary waiver was both correct and reasonable.

Having determined that the actions of the Defendants were right, not wrong, that is
the end of the case; it is not necessary to pursue the analysis concerning the appropriate
standard of review any further.

## CONCLUSION

The Court sympathizes with the Plaintiff's plight.  He made a simple mistake with
significant adverse consequences.  But hard cases cannot be permitted to make bad law.
Accordingly, it is hereby ORDERED and ADJUDGED that the Plaintiff's Motion for
Summary Judgment (Doc. 30) is DENIED, and the Defendants' Motion for Summary
Judgment (Doc. 31) is GRANTED.  The Defendants' decision to terminate the Plaintiff's
participation in Sprint's retiree medical benefits plan is AFFIRMED.  The Clerk is directed
to enter judgment accordingly, terminate all pending motions and close the file.

IT IS SO ORDERED.

---

[59]The decisions Schwartz relies upon to support his argument that he must first receive
consideration before his waiver can be effective are not persuasive.  Those decisions either
involve the negotiated waiver of participation in a pension plan, which creates vested rights and
is entitled to much greater protection under ERISA (see Laniok v. Advisory Comm. of the Brainerd
Mfg. Co. Pension Plan, 935 F.2d 1360 (2d Cir. 1991)), or they involve situations where an
individual waived participation in benefits plans as part of a negotiated severance or settlement
agreement (see Mastrianni v. Bayer Corp., 2006 WL 752888 (D. Conn. Mar. 21, 2006); UNUM Life
Ins. Co. of America v. Cappello, 278 F. Supp. 2d 228 (D.R.I. 2003)).  None of these decisions
involved a unilateral, voluntary waiver of plan participation similar to the one involved in this case.
Cf., Laniok, 935 F.3d at 1365 ("ERISA does not require all eligible individuals to participate in a
plan, explicitly recognizing, for example, that an employee may decline to contribute to a plan that
requires employee contributions for participation.").

DONE and ORDERED at Ocala, Florida this 28th day of November, 2006.

_____

**UNITED STATES DISTRICT JUDGE**

Copies to:   Counsel of Record